Good morning ladies and gentlemen. First case for argument is Peery v. Chicago Housing Authority. Mr. Schwartz. May it please the court. The plaintiffs are Chicago Housing Authority residents who live in public housing units in the CA's new mixed-income developments. They seek to stop drug testing. The issues on appeal are whether or not there is CHA state action and whether the plaintiffs have consented to the drug testing. The plaintiffs seek from this court reversal and remand with instructions to enter the preliminary injunctions. The state action in this case rests upon four nested foundations. First, the CHA repeatedly and directly has acted to prevent drug testing. Number two, the CHA has involved itself in the most important aspects of implementing the drug testing including whether it is possible to transfer to avoid it and the consequences of failing or refusing the drug test. Number three, the CHA has reserved... Do not pay attention to the city's advice. I think that what is happening here is that the CHA wants to have the drug testing where it can get it and it has... But that doesn't sound like an exercise of government power. That sounds like, you know, remember Mayor Balandic in New York. He didn't want stores to sell, you know, sugary drinks in large containers, right? If he just says, I think it's unhealthy, shouldn't do this, that's just giving advice. That's not an exercise of state authority, is it? Well, I think if that is all that the CHA had done, that would be one thing. But what we have in this case is a record of much more action by the CHA. But how do you explain this 44% of the developers that don't pay any attention to this? I think that the CHA has focused its energies on the larger developments where the majority of the CHA units are located. And we see this, for example... And how is this energy exerted or expressed? Well, it's exerted, for example, when one of the defendant developers, the community residents, that did not have mandatory drug testing at one of the phases of Oakwood Shores. And the CHA sends an email to them that says, we, the CHA, do have a problem with the absence of mandatory drug testing. It is sitting on our land. And within a day of that email, the developer changes its mind and does have some of the mandatory drug testing. And we see it again with the same developer... But did the CHA... You didn't order them, order the developer to do it. You said we don't like this. Well, under one of the tests for state action, the question is whether or not the CHA has encouraged or coerced. And that's in the disjunctive... I don't understand encouragement. As I say, government officials are constantly making recommendations, advising people, encouraging. I mean, what if the president says there are too many obese Americans? You ought also to be... You all ought to be eating vegetables. That's not state action, is it? Well, we've got much more here than the government issuing... What is the much more? I don't understand. Well, in addition to all of the direct actions of which I've... Why do you call direct actions? They sound like simply the government saying, we'd like to have this drug testing. We're not ordering it, and a lot of you developers are not doing it. We're not punishing you. Well, I think when the government says to the private actor whose policy they're objecting to, it's sitting on our land, that is a demand that they recognize the continuing authority that the government has there. But even this court was not persuaded that. There is alternative foundations for state action in this case. So, for example, the CHA has reserved to itself the power to make decisions regarding the selection criteria at the mixed income developments. So, number one, they have a minimum tenant selection plan that they can alter, increase at will without any check from another party. Right, but drug testing isn't part of it. The drug testing is not in the minimum tenant selection plan, but this is exemplary of a where the CHA has reserved to itself the power to make decisions regarding the selection criteria. And under this court's decision in Airlight Pilots Association, and similar decisions from numerous sister circuits, it is the reservation of the power to make the decision that comprises the state action. But are you saying any time the government encourages some action, and it could, but does not back it with, you know, legislation or executive order, that that is nevertheless state action? I'm not saying any time. I think every case, you know, has to be addressed on its own, very specific facts. I think that the relationship that the CHA has with the developers in this case is not a typical relationship. This isn't just the government approving a permit or executive involvement. I do want to address why this case is similar to Airline Pilots. In Airline Pilots, the government hired a contractor to manage its display case advertisements at O'Hare Airport, and a union's advertisement was excluded. And this court concluded that it was impossible to sort out who really excluded the advertisement. And even if it was the contractor who had exclusively made the decision to exclude it, nonetheless there was state action, because the airport authority had reserved to itself the power to make decisions regarding which displays go in and out of that. And so it was the reservation of power, whether or not the power had actually been exercised, that created the state action. And so when the government issues a public service announcement that says, you ought to use less sugar, or when it actually calls up a bunch of restaurants and says, we think you should have less sugar in your drinks, that is completely unlike the situation here, where the analogy would be restaurants have to go... I don't understand. What's the difference? The difference is, in order for the restaurant example to be like this one, we would need a rule that says, restaurants, you cannot decide what to put on your menus, including how sugary your drinks are going to be, until you go to the relevant governmental agency and notify them of your plan, and receive feedback from their lawyers, and the lawyers review that plan with the constitution in mind. That's not what happened here. It is what happened here. No, it isn't what happened here. Well, under the... The government has not ordered any of these developers to drug test people. Let me ask you this, do you object to vaccination, compulsory vaccination for contagious diseases like smallpox and polio? I don't think that the ACLU... Answer my question. Do you object to compulsory vaccination against contagious diseases? Yeah, I don't want to mince words, but the ACLU has... Would you answer my question? I don't know the ACLU's position on that question. Excuse me? I don't know the ACLU's position on mandatory vaccination. I'm asking you what you think, whether you think compulsory vaccination against contagious diseases is a good policy or a bad policy. I think when the government compels vaccination... Would you answer my question? It's a yes or no answer. My personal opinion is that the mandate of vaccination is a good policy. I don't know if that's the ACLU's policy. I do think that that would be safe action. I'm sorry, you say it's... What came after good policy? You think it's a good policy, but? I want to make it clear that I'm here as... Oh, please, stop fencing with me. You think it is a good policy. Do you think the government is empowered to require compulsory vaccination? I think when we talk about required... Hopeless. I ask you questions which can be answered yes or no, and you refuse to answer them yes or no. The question is whether or not the government can compel mandatory vaccination. And number one, I think that sometimes it can, under the Fourth Amendment. Sometimes? When can't it? I'm sorry, Your Honor. This is an area of Fourth Amendment law that I have not prepared for in the argument today. I think there are numerous cases. I do not know how they have come out. What I do know... Why isn't drug testing very similar to vaccination? If you live in one of these developments, wouldn't you like to know that everybody had been drug tested, and if they flunk their drug test, they're expelled? You don't want to live with a bunch of druggies, do you? Well, I think that the answer to that question should be no. I think that it is rare in the extreme for drug testing to be a requirement of living in housing anywhere in this country. I believe that it is stigmatizing to do it in the context here where there are public housing residents. I do want to emphasize that mandatory vaccination would be state action, and that it would trigger special needs analysis. And special needs analysis is not before the court because the defendants moved, and the district court agreed over our opposition to bifurcate this case. We wanted to do special needs discovery and show the unreasonableness of the drug testing regime. But that issue has been removed. With this court's or the panel's permission, I'd like to reserve my remaining time for the rebuttal. Sure. Okay, thank you, Mr. Schwartz. Mr. Mendenhall? May it please the court. The district court ruling should be affirmed in its entirety because the CHA does not require drug screening. Those are the policies of HMC and TCBs, which are private actors and are not state actors. Alternatively, the district court also correctly found that even if it was state action, the plaintiffs have consented. For both of those reasons, the ruling should be affirmed. The appellant's arguments today and in their brief demonstrate that primary disagreement is not with the court's application of the law, but rather the district court's factual findings. However, appellants do not get to write on a blank slate before this court. They disregard the fundamental standard of review that, namely, the district court's fact findings should not be set aside unless clearly erroneous. They have cited to no such error today, nor have they done so in their briefs. To the contrary, all of the district court's factual findings are amply supported by the record. For this reason alone, the district court's order below should be affirmed. The district court's key factual finding is summarized as follows. The record demonstrates that CHA was not driving the drug testing policies of the mixed income developments, nor did it administer or enforce the policies. Indeed, if CHA was pushing the drug testing, it was not doing a very good job, particularly if it had the control over the process that plaintiffs claim, since only 10 of the 32 mixed income developments had drug testing. As the district court correctly concluded, there is no support in either United States Supreme Court or this court's jurisprudence for finding state action under these set of facts. At bottom, this case amounts to a policy disagreement appellants have with CHA's decision to respect the developer's individual choice regarding drug screening. Such policy disagreements do not make justiciable constitutional claims. Well, this is a classic public-private partnership structure, and it's pervasively regulated by both local and federal law, and the leases have to be approved by CHA, and they are three-way leases between the developer, CHA, and the tenants. Why isn't that regulatory scheme enough to make out a state action claim? Judge, you're correct regarding the facts you've stated, but the law states that mere government regulation is not enough for state action. That's the Blum Supreme Court holding in Blum, Rendell, Baker, and several other cases. They say for there to be state action, there must be significant encouragement or coercion on behalf of the state as it relates to the specifically challenged activity. In this case, that would be drug testing, Your Honor. And it is clear that the CHA has not coerced or significantly encouraged such conduct as it relates to the drug testing, and that's brought home by several facts. Your Honors, there were 32 separate tenant selection plans brought before the CHA. Only 10 of them have drug testing. 22 percent of them, which is 70 percent of the time, CHA approved it without drug testing. That is an overwhelming majority of the time, so CHA clearly has not thrown its weight behind it as required under Supreme Court jurisprudence, and CHA has simply left that to the developers. As you correctly pointed out, Your Honor, the minimum tenant selection plan, which contains the CHA requirements for the developers, does not contain a drug screening provision. CHA has left that choice up to the individual developers if they seek to add any additional requirements beyond the minimum tenant selection plan. And then, and only then, CHA says if you do add some legally, lawfully allowed provision, you then must make sure it's applied equally and fairly to all residents, market rate, affordable rate, and CHA tenants alike. So CHA does not stigmatize its residents, and nor would it allow a private developer to do so. Well, the plaintiffs are claiming that the CHA is focusing its efforts to extract drug testing requirements on particular developments, and it's selecting its developers with that goal in mind. How do you respond to that claim? Yes, Your Honor, there is no support in the record for that, and I'm glad you raised that issue. Were there other developers that didn't drug test? Yes. Was the CHA rejected in favor of the ones who did drug test for these properties? Your Honor, you're absolutely right. Mr. Swartz said that CHA drug tests at the larger developments. Parkside is a development of 176 CHA residents. Roosevelt Square, another mixed-income community, has 245 units, almost 100 more than Parkside, which is at issue. There's no drug testing. West Haven, another mixed-income community, has 237 units, again more than 176 units. No drug testing. Park Boulevard has 137 units, almost as large as Parkside. No drug testing. Were there other developers who do not require drug testing considered for these subject properties? Yes, and I'm glad you raised that issue. Yes, Your Honor, I can tell you how the process worked. At Parkside, where HMC is the developer, there's a consent decree. You may have read the Cabrini-Green Consent Decree. Under the consent decree, different developers were brought before the working group, which was comprised of the CHA, the public housing residents of Cabrini, the City of Chicago, the Habitat group, as well as the control planners. Each of them had one vote. CHA had no greater voting power than any other member of the group. And then once the working group was convened, Your Honor, they brought in developers to take a look and make their best presentation for the property. Under the consent decree, and it's found on page 5 of the consent decree, Your Honor, it says that this group will select a developer. So that's the first fallacy that counsel has pointed out. Well, they're claiming that the CHA controls the working group. Even though all votes are equal, CHA is first among equals and throws its weight around. Your Honor, they can claim a lot of things respectfully, but the record shows otherwise. And that's not supported in the record. It's not supported in the facts. I can't control what plaintiffs claim, but I can state to you what's in the record. And in the record, CHA has no greater voting power and does not throw its weight around. If it was throwing its weight around, I assure you 70% of the developments, how could it be throwing its weight around if 70% of the developments do not have drug testing? Again, Your Honor, what this boils down to is simply a policy disagreement. As the district court correctly stated, she said, essentially, plaintiffs are asking this court to find state action based upon the fact that including drug screening as part of their site-specific criteria. No supporting jurisprudence exists for such a proposition, Your Honor, and they did not present one today, nor did they present one at the district court, and they cannot because there's no basis in law for such a proposition. Your Honor, a couple of key facts that I would like to simply point out. Mr. Swartz stated that at Oakwood Shores, TCB originally did not have drug testing, and then the working group asked them to add it, and the CHA demanded that they add it. Your Honor, that is not accurate. At TCB, with respect to the development of Oakwood Shores, again, to your point, CHA selected a developer that did not, the developer that was selected did not have drug screening. So the claim that we want, and that's the largest property out of all of them, of the 32 developments. TCB, which was selected, did not have drug screening, so the working group selected a developer that didn't have drug screening, which directly contradicts the claim that we were selecting developers for the large properties, in addition to the evidence I've already showed you that had drug screening. But what happened then, the members of the working group, including the public housing residents, for that development asked for drug screening. CHA was not one of the members that asked for that. CHA took no position for or against it. So once the developers received the request from the residents and other members of the working group, they then decided to add it. It was up to them to accept it or reject that proposal. If they would have rejected it, that would have been absolutely fine with the CHA. That is the individual developer's responsibility. We did not create. We did not implement. We had nothing to do with that decision. And then years later, Your Honor, an issue came up regarding what Mr. Swartz referred to about CHA's statement doesn't even relate to CHA property. That was a senior building governed under HUD rules. And even then, as Lee Prater testified at the preliminary injunction hearing, that was Shirley Newsome, one of the resident leaders, who said that the working group wanted testing everywhere and that seniors do drugs, too. So the statement that they're attributing to the CHA, the record at the district court shows it was Shirley Newsome who made the statement, not the CHA. Did you say that residents had requested drug testing at one of these? Yes, Your Honor. The development of Oakwood Shores, it was the residents who requested the drug testing. Is there any low-income housing nowadays that is operated directly by the CHA? Or is it all part of this public-private model? Yes, there is. And, Your Honor, I'm glad you asked that. There are 7,000 units of traditional public housing still, and there's no drug testing at any of that housing. There are 9,000 units of senior CHA housing. There is no drug testing at that housing. What's the 9,000? I'm sorry. Senior CHA housing. Senior? Yes. And then there's 2,800 units of scatter site CHA housing, and there's no drug testing at that. So any housing operated directly by the CHA does not have drug testing. Not one. Zero percent, Your Honor. Your Honor, briefly to the matter of consent, the alternative ground that the court found there was no basis for relief. Each of the appellants moved to Parkside and Oakwood Shores knowing that there was the drug screening policies at the place, at the respective developments. Each of them have chosen to remain at the developments knowing that there's drug screening at the developments. They are eligible to apply for a resident-initiated transfer, and none of them have ever done so. Indeed, Mr. Perry lives in the Cabrini-Green area where there are nine properties without drug testing, one literally across the street, almost a distance from where I am to where the panel is seated, and yet he hasn't requested to do so. CHA has told him his request would be granted if he wants to move, but he hasn't done so. In conclusion, Your Honor, they do not write on the blank slate. The district court's findings are amply supported by the record, and we respectfully ask that this court affirm that decision. Thank you for your time. Thank you, Mr. Mendenhall. Mr. Schwartz, how much time does he have? Four minutes. I'd like to begin my rebuttal by addressing one of the questions that Judge Sykes asked about the process for approving the selection criteria, which merges with Mr. Mendenhall's first point about whether this is a de novo review of a holding of law as opposed to a clearly erroneous review of findings of fact. The facts concerning the process of making the selection rules are undisputed, and I'm just going to recite the testimony of the CHA's witness at the hearing. They have this minimum tenant selection plan that they can change at will. All of the proposed selection rules that come from the developers have to go to the CHA for review, where they are reviewed by three different CHA departments, including the legal department, which reviews for compliance with the Constitution in mind. Then it goes out for repeated rounds of review that involve public stakeholders, including a public notice process that is administered by the CHA, which leads to further revisions. And through this process, the CHA asks for dozens of revisions and gets dozens of revisions. And then it goes to the CHA board, which has to decide whether or not to approve it. In the absence of the CHA's approval, there would not be any of these selection criteria, including the drug testing. And it has the power to veto or require amendments before the approval. So these are all the undisputed facts. Whether or not these facts together comprise a, quote, sufficiently close nexus, close quote, between the state and the challenged activity is a legal question for this court to decide de novo, without regard to all of the other facts that we have presented in the record. I also want to point out the CHA's role in choosing the developers. It is true there is this working group process. But again, the decision ultimately goes to the CHA board for selection of the developers. How is what you're saying consistent with the facts recited by Mr. Mendenhall? Well, I don't think Mr. Mendenhall just now said anything contrary to my recitation. Mr. Mendenhall has the ultimate conclusions from the district court that there is non-state action or that there is a close nexus. He made a number of specific factual statements in his argument about the number of these developments that have drug testing, the size of the developments, that the very large ones often have drug testing or do not have drug testing, contrary to your suggestion, which was that the CHA was focusing on the large developments. I think that the numbers are not in dispute. If one was to look at Exhibit 88 of the Plaintiff's Preliminary Injunction Hearing Exhibits. So you accept the numbers he gave? Well, I think that the origin of the numbers is an interrogatory answer that walks through every development and recites the number of CHA units and whether or not there is drug testing. Did he make specific errors in what he was saying in the argument? Mr. Mendenhall's numbers in his argument, as far as I know, are correct. Well, don't they suggest that even many of the large developments do not require drug testing? I think that there are some that do not, but the point is that if one looks at all of the CHA... He said the largest do. How does that square with your proposition that the CHA controls this process? Wouldn't they want their very largest development? If one adds up the number of CHA units and looks at which ones have drug testing, one finds that 56%... Explain to me why the largest doesn't have drug testing. I can't explain that, but the point is that the CHA... Do they suggest that these developments can do what they want and they're not coerced by CHA? Again, it doesn't have to be coercion. Well, then you get to the question whether government encouragement is state action. Under the leading Supreme Court cases, one of the tests is encouragement or coercion. I don't understand that because political officials are constantly telling people what they think they should do. I think that if one looks at... Without coercing them. If one looks at... They advertise, they make speeches, right? That's not state action. I think that if one looks at the totality of facts in the record in this case, it does not look like the scenario that you have just recited. I would just close by saying that the plaintiff CHA residents are among the most vulnerable members of our society and they ought not have their constitutional rights diminished because of the CHA's plan for transformation. And we respectfully request this court's reversal and instructions to enter the preliminary injunction. Okay, well, thank you very much, Mr. Schwartz and Mr. Manzino.